**Mertz v. Mertz**

*Andrew D. Lyons*, for petitioner.
*H. William Koch*, for respondent.

KREHEL, *P.J.*, November 9, 1982—Frankie E. Mertz, Jr. (hereinafter Frankie) is the now 13-year-old subject of a custody dispute between the birth-parent mother, Mary J. Mertz, and the birth-parent father, Frankie E. Mertz, Sr.

As a result of the mother's petition for custody, a hearing was held on November 24, 1981, wherein documents were admitted, the parties' positions were presented through their counsel to this court, and the testimony of Frankie was taken in chambers with counsel for both parties present. Home-study reports for both residences were subsequently submitted to the court by Northumberland County Children and Youth Services.

Custody of Frankie and his sister, Patricia, were given to the mother by way of a marriage settlement agreement dated September 23, 1978. The Mertzes were divorced about a year later on June 12, 1979. One Friday in August of 1981 Frankie was disciplined in his mother's home for something he felt he didn't do. He left the home and a few hours later appeared at his father's home, reluctant to return. The father related to the mother that he felt Frankie should remain there for the night until he was settled down. Frankie has yet to return to his mother, and his father has refused the mother's repeated request for his return. She then filed her petition to regain custody of their son.

This court has repeatedly maintained that while both parents may love their children, their sole concern should, therefore, be the same as the court's concern: the best interest and permanent welfare of the children: Com. ex rel. Chappell v. Chappell, 53 Northumberland 179 (1982); Com. ex rel. Knouse v. Knouse, Northumberland Co., CV 80-2251 (1982). While "the views of the respective birth-parents may differ as to what is 'best' in each instance, . . .

both views are subject to the determination of this court as to the 'best interest and permanent welfare' of each child." Chappell, at 181; this court's stated policy since early 1976.

For the reasons hereinafter discussed, we grant a return of custody to the birth-parent mother, Mary J. Mertz.

It is undisputed that the father spends time with Frankie doing the kind of things a boy of his age loves to do—hunting, fishing and playing ball. It is also true, as gleaned from the Children and Youth Services' report, that the father's home is in generally good condition. There are a number of other considerations, however, which must be brought to light.

There appears to be some evidence that Frankie lacks a structured environment at his father's home. There is evidence that he is permitted to stay up as late as he wants on weekend nights. Frankie's testimony in Chambers was somewhat less than credible for reasons we will refer to later. There he claimed that he went to bed every week night at 9:30 or 9:45 p.m. by his own motivation.

A letter from Frankie's orthodontist, Carl E. Oberheim, D.M.D., indicated that since Frankie has been with his father, he has not been taking care of his teeth through brushing. He and/or his father have had difficulty in keeping his appointments. Frankie testified that he brushes his teeth three times a day at his father's. Dr. Oberheim said there were no problems with appointments or brushing while with his mother.

Frankie had complained to his mother on several occasions after he returned from visiting his father that he was hungry. Children from the former marriage of the father's present wife, Clara, had visited

the residence and complained to their grandmother that there wasn't enough food to eat.

There is also evidence of a lack of discipline in the home. This is supported in part from Clara's children when visiting. It is also supported by a neighbor who heard Frankie say to her that he didn't have to call his father to tell him where he was because his father never disciplined him. Frankie denied this.

The father, by his own admission, has not taken any positive steps to provide for Frankie's spiritual well-being. While the father has offered to take his son to church, it is only if Frankie wants to go. The father himself does not attend nor does he even encourage his son to attend.

Another indicating factor in examining the fitness of a parent to provide for a child is their employment history and habits. The father has held numerous jobs for short periods of time. He was fired from several of them. Although he is currently employed, we think the history is significant—especially in contrast to the mother's steady employment history.

On the authority of Com. ex rel. Hughes v. Foster, 225 Pa. Superior Ct. 436, 441, 311 A. 2d 663, 665 (1973), we must also view with significance the initial agreement between the parties in which the father voluntarily gave custody of *both* children to the mother:

"Private custody agreements are certainly not paramount to the best interest of the child (Citations omitted.) Wherever possible, however, private resolutions governing domestic relations ought to be given considerable weight in evaluating the intentions of the parties at a particular time, and should be given effect wherever possible without contravening public policy." The instant case involves a

custody agreement less than three years old at the time the father kept the son in his custody.

When the father kept custody of Frankie, he was exercising a self-help remedy and at the same time forcing the mother to resort to legal action.

This practice has been frowned upon by both this court in Chappell, supra, and the Superior Court in In re Leskovich, 253 Pa. Superior Ct. 349, 385 A. 2d 373 (1978). It reflects a disrespect for the legal process which bears on his fitness. Contrast this with the mother's pursuit of proper legal action to regain custody of their son.

We also ask the question: If the father is so concerned about their son and the fitness of his mother, then why has he not also asked for custody of their daughter? He has expressed no concern for her and has offered no explanation why he is concerned about one child and not the other.

While young Frankie expresses a preference to live with his father, minimum weight is to be given this preference. In addition to the contradicting evidence regarding Frankie's oral hygiene, his testimony that his mother's paramour, Mr. Shultz, "kicked him around twice a week" was later admitted by him to the Children and Youth Caseworker to be untrue. In actuality, Frankie admitted that Mr. Shultz only spanked him twice *ever* and that he was not unduly harsh with him. While Frankie told the Caseworker he was confused and nervous at the time he testified, we cannot help but question whether Frankie was intentionally exaggerating to "build" the case for his father. He was certainly old enough to know that his testimony could influence the final decision of where he would live. His main reasons for wanting to live with his father seem to be that his mother is too strict, Mr. Shultz does not

play with him, and his father does play with him and takes him hunting and fishing.

Frankie, as a young boy, unquestionably has the need to engage in these kind of activities with his father. We see no reason why Frankie and his father cannot enjoy these things together on weekend visitations, as established in the prior custody agreement. Visitation seems ideally suited for this.

The fitness of the mother was never seriously challenged by the father. The relationship between her and Mr. Shultz appears to be somewhat stable and this relationship cannot be a factor unless it affects the best interest of Frankie: Com. ex rel. Myers v. Myers, 468 Pa. 134, 360 A. 2d 587 (1976).

Living with his mother and Mr. Shultz seemed to have been satisfactory to all concerned until Mr. Shultz's son, Aaron, came to live in the house. The Children and Youth Caseworker reported that the problem seemed to be that of a diversion of attention in the household away from Frankie and towards Aaron.

Aaron is younger and it is natural for a boy Frankie's age to become jealous and fail to understand that less mature behavior would be more tolerable from Aaron as opposed to him. This would explain Frankie's perceived "harsh" and "unfair" treatment which caused his move in the first place. We feel, along with the Children and Youth Services, that this problem is not unusual and can be ultimately worked through if Frankie lives with his mother. Viewing all the circumstances, we determine that Frankie's best interest will be served by returning custody of him to his mother.

We note, finally, that the mother desires through her petition to confirm her present custody rights in their daughter, Patricia A. Mertz, born January 12,

1972. The father has not contested this issue in any way.

Accordingly, we enter the following

### ORDER

And now, November 9, 1982, it is ordered, adjudged, and decreed that custody of the minor child, Frankie E. Mertz, Jr., is hereby awarded to the birth-parent mother, Mary J. Mertz, and said custody shall be transferred to her from the birth-parent father, Frankie E. Mertz, Sr.;

And further, that visitation rights of the father shall be every weekend for the next three weeks only and thereafter shall be in accordance with the marriage settlement agreement made between the parties on September 23, 1978;

And further, the custody of the minor child, Patricia A. Mertz, is hereby confirmed in the birth-parent mother, Mary J. Mertz.